UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DUSTIN MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-00207-TWP-TAB |
| | ) | |
| NTN DRIVESHAFT, INC., and JASON SHAKE, | ) | |
| | ) | |
| Defendants. | ) | |

### ENTRY ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Court on a Motion for Partial Summary Judgment (Filing No. 27) filed by Defendants NTN Driveshaft, Inc., ("Driveshaft") and Jason Shake ("Shake") (collectively, the "Defendants"). Plaintiff Dustin Miller ("Miller") alleges in his Complaint that he was terminated in violation of the Family and Medical Leave Act ("FMLA") as well as state law claims for defamation and negligent supervision. (Filing No. 1.) For the reasons that follow, the Court **grants in part** and **denies in part** the Defendants' Motion for Partial Summary Judgment.

### I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Miller as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Miller began working at Driveshaft on September 6, 2011. (Filing No. 29-2 at 15.) He was promoted to set-up technician on June 13, 2015, and at the time of his termination Miller was a set-up technician. (Filing No. 29-2 at 130.) Set-up technicians are responsible for catching cautionary red lights on the machines and changing over lines to get the machines back into production. *Id.* at 29. It is undisputed that changeovers are high-priority tasks

because production is stopped during a changeover and the changeover should be completed as quickly as possible. *Id.* at 31-32. For the lines on which Miller was tasked with changeovers, the expected changeover pace was as follows: the CG (clip groove line) – 90 minutes start to finish; and the TJ2 and BJ2 lines (the grinder lines) – 120 minutes start to finish. ([Filing No. 29-2 at 143.](#))

Miller received various disciplinary warnings throughout his tenure as a set-up technician. On September 22, 2015, his supervisor, Shake, rated Miller as "Partially Meets Expectations" in four categories "Quality, Job Knowledge, Initiative/KAIZEN, and Safety, Health 5S's". Shake reported that Miller was "doing a good job he needs to push to learn all the lines and cut his c/o times in half." *Id.* at 131. On January 28, 2016, Miller received a verbal warning for an attendance issue. *Id.* at 135. On March 28, 2016, he received a verbal warning for not clocking in or out on March 10, 11, and 21, 2018. *Id.* at 137.

On April 4, 2016, Miller's vision became blurry and his left eye started to swell shut. He reported a workplace injury to Shake when his face started to swell and stated that he had been struck in the face by a loader earlier that day. ([Filing No. 29-2 at 53.](#)) Shake directed Miller to leave to take a urinary drug screen, which came back negative. *Id.* ([Filing No. 32 at 1.](#)) Miller then left work to go to the emergency room and was diagnosed with cellulitis of the face. ([Filing No. 33-1 at 7.](#)) A healthcare provider, Physician Assistant Jared Brock ("Brock"), certified Miller for absence under the FMLA from April 5 through April 26, 2016, to cover his hospitalization and recovery. *Id.* Miller alleges that his co-worker, Adam Lilak ("Lilak") telephoned Miller's father while Miller was in the hospital, to warn him that he had been removed from the schedule and replaced with someone from third shift, indicating that Miller had been fired. ([Filing No. 33-2 at 10.](#)) Lilak testified that he informed either Human Resources, Kathy Littleton ("Littleton") or Miller's father to "get a hold of somebody" regarding Miller's hospitalization. *Id.*

2

Miller made multiple telephone calls to Littleton to have Shake's alleged attempt to terminate him reversed and complained to Littleton that firing him while he was off work on FMLA leave was a form of harassment. (Filing No. 33-1 at 2.) On April 21, 2016, Miller was treated at Columbus Regional Hospital and diagnosed with facial abscess and a methicillin-resistant staphylococcus aureus ("MRSA") infection. *Id.* at 15. Miller returned to work on April 27, 2018. (Filing No. 37-2 at 2.)

Following his return to work, Miller received additional disciplinary warnings. On May 13, 2016, he received a written warning for going on a break before getting a line back up and running. (Filing No. 29-2 at 139.) On June 20, 2016, he was placed on a sixty-day performance improvement plan. *Id.* at 143. Areas of concern listed the following: "change over times, trouble shooting skills, and break times/not staying in the department." *Id.* On July 31, 2016, while on the performance improvement plan, Miller received a written warning for a quality issue due to line checks not being completed on time. *Id.* at 152.

In August 2016, Miller's doctor certified a second FMLA leave from August 8 through 16, 2016. (Filing No. 33-1 at 17.) His physician suspected that the MRSA bacteria was penetrating Miller's skin through damage caused by industrial solvents used in the machinery Miller operated at Driveshaft. The certification stated that Miller would also require intermittent leave, one time a month, five days per episode because the MRSA would occasionally flare up. *Id.* (Filing No. 29-2 at 155.) To prevent the MRSA from rapidly spreading which would require hospitalization, Miller needed to promptly apply antibacterial ointment and bandage his wound when the MRSA started to flare up. (Filing No. 29-2 at 56.)

On September 23, 2016, Miller had been at work for approximately an hour when he began to experience pain on his forearms, which he recognized as the symptoms of MRSA. (Filing No.

3

33-3 at 3.) Lilak also observed Miller's arms and testified that "it looked like MRSA, pimpled up sores and whatnot." (Filing No. 33-2 at 11.) Because Miller only had a small amount of antibacterial ointment with him, he told Shake he could only work a half day so that he could go home and get more ointment and bandages. (Filing No. 29-2 at 86.) When Miller told Shake about the MRSA flare up, Shake responded with a pretend cough and told Miller he was taking too much sick time. (Filing No. 33-1 at 3.) Miller resumed working at his line, however, his outbreak and the pain worsened. *Id.* Miller told another set-up technician, Mazio Mack ("Mack"), that he was going to the locker room to bandage the MRSA area. (Filing No. 33-3 at 5 at 5.) Mack testified that Miller showed him his forearms which looked irritated, and the last he saw of Miller was when Miller headed to the locker room to change his bandage. *Id.*

In the locker room, Miller removed his shirt, applied the topical ointment, and bandaged the wound with gauze and non-stick tape, before returning to his line. (Filing No. 33-3 at 3.) Shortly after returning to the line, Shake and a woman from Human Resources came to Miller's area and told him to follow them to the office. *Id.* Shake told Miller that he was terminated for taking too long on breaks. (Filing No. 29-2 at 90.) At the time of Miller's termination, he was not under a final warning status or any type of disciplinary probation such as the performance improvement plan. (Filing No. 33-4 at 3.) Lilak testified that after Miller was escorted off the premises, Shake told Lilak and another employee that "Dustin did not have MRSA, he had the clap." (Filing No. 33-2 at 12.)

After his termination, Miller went home and applied more ointment and scheduled a doctor's appointment at his doctor's earliest convenience. (Filing No. 33-1 at 3.) Miller's doctor's appointment was scheduled three days after his termination, on September 27, 2016. Brock diagnosed Miller with cellulitis on his arms and prescribed additional antibiotics. (Filing No. 33-

4

1 at 19.) Miller secured employment with Sacoma from the end of February 2017 to late August 2017, when he was terminated for attendance issues (Filing No. 29-2 at 110; *see* Filing No. 29-2 at 160). In December 2017, Miller began working as a driver for his father, who contracts with the United States Postal Service to deliver mail. (Filing No. 33-1 at 4.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id*.

5

## III. DISCUSSION

Driveshaft contends that it is entitled to summary judgment on Miller's negligent supervision claim as well as an order limiting Miller's damages following his separation of employment from Sacoma. The Court will address each contention in turn.

### A. Negligent Supervision

"Negligent retention and supervision is a distinct tort from respondeat superior; it may impose liability on an employer when an employee 'steps beyond the recognized scope of his [or her] employment to commit a tortious injury upon a third party.'" *Scott v. Retz,* 916 N.E.2d 252, 257 (Ind. Ct. App. 2009). Negligent retention and supervision "has the following elements: 1) a duty of care owed by an employer to a third person; 2) breach of that duty; and 3) injury to the third person proximately caused by the employer's breach." *Id.*

At the outset, Driveshaft raises a threshold issue arguing that the Court should grant summary judgment on Miller's negligent supervision claim because when asked what facts supported this claim during a deposition, Miller responded that Driveshaft's management allowed Shake to pass a basket of "out of spec" parts on one occasion. (Filing No. 36 at 12; Filing No. 29-2 at 120.) Miller's counsel objected to the question stating that it "calls for a legal conclusion from a lay witness", but directed Miller to answer. Miller's counsel concedes that Miller's testimony regarding Shake's passing of defective parts could not sustain a negligent supervision claim, but instead contends that the Court should "treat as the basis for Miller's negligent supervision claim the events set forth in Plaintiff's Complaint." (Filing No. 32 at 5.) The Court agrees. It would not be appropriate to allow a lay witness to answer a legal question and then to lock him into that statement when he did not, and could not, understand what was being asked, particularly so when Miller's counsel objected to the question.

6

Turning to the merits, Miller contends that the elements of negligent supervision are present in this case due to Driveshaft breaching its duty to allow Miller to take FMLA leave to treat himself for MRSA, and the fact that he was terminated for taking excessively long breaks while treating his MRSA. *Id.* at 6. Additionally, Miller asserts that Driveshaft had advance warning of Shake's propensity to retaliate against him for using FMLA leave, because Shake had attempted to terminate Miller the first time he took FMLA leave. Driveshaft does not dispute that it owed a duty to provide FMLA leave to employees who are eligible, *i.e.,* Miller when he was having a MRSA outbreak. ([Filing No. 36 at 15-16.](Filing No. 36 at 15-16)) However, Driveshaft responds that the second prong of the Miller's burden (Driveshaft's breach of its duty) is fatal to Miller's negligent supervision claim. Driveshaft explains that Miller has no evidentiary support that Shake attempted to terminate Miller for availing himself of FMLA leave during April 2016, when the MRSA issue began.

As noted previously, negligent retention is a distinct tort from *respondeat* superior. "Although summary judgment is 'rarely appropriate' in negligence cases, a defendant is entitled to summary judgment when the undisputed facts negate at least one element of the plaintiff's claim." *Scott,* 916 N.E.2d at 257 (quoting *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004)). "[A]n employer is not liable simply because an employee did something wrong; the employer must have known (or should have known) that there was a need to prevent the harm from occurring in the first place." *Sims v. Humane Soc. of St. Joseph Cty. Indiana Inc*., 758 F. Supp. 2d 737, 750 (N.D. Ind. 2010).

Taking as true that Shake attempted to retaliate and terminate Miller for taking intermittent FMLA leave to treat his MRSA, Miller has not shown that Driveshaft breached its duty. Moreover, Miller lacks admissible evidence for his argument that Shake attempted to terminate him while he

7

was out on leave in April 2016. Lilak, who could not remember whether it was Littleton or Miller's father that he talked to about Miller's hospitalization, provided the only evidentiary basis, in the form of speculation, supporting Miller's allegation that Shake attempted to terminate him during following his first MRSA outbreak. ([Filing No. 33-2 at 10](#)) ("I believe they were trying to fire him at that point."). This incident is the foundation for Miller's negligent supervision and retention claim, in that Driveshaft's "management had advance warning of Shake's propensity to retaliate against Miller for availing himself of his FMLA entitlement because Shake attempted to fire Miller the first time he took FMLA leave. . ." ([Filing No. 32 at 6](#)). Driveshaft concedes that Miller received a termination paper that was automatically generated by the computer based on attendance. ([Filing No. 29-3 at 53](#).) Upon Miller's return to work following his hospitalization, Shake directed Miller to take the termination paper to Human Resources, as only Human Resources could adjust FMLA time. *Id.* Other than this incident, Miller has not alleged that Driveshaft's management had knowledge of Shake's propensity to retaliate against him for taking intermittent FMLA leave in support of Driveshaft's breach of its duty to prevent Shake's termination of Miller due to his second FMLA leave request. Miller also alleges that after his termination, Lilak witnessed Shake talking to another supervisor, Bill Powers, about Miller, telling fellow employees that Miller "suffered not from MRSA, but from the clap." ([Filing No. 33-2 at 12](#)). Because this incident was after Miller's termination, it fails to provide support for Miller's negligent supervision claim.[1] Because Miller has failed to establish a *prima facie* case on his negligent supervision and retention claim, Driveshaft's Motion for Partial Summary Judgment is **granted**.

---

[1] Defendants have not moved for summary judgment on Miller's defamation claim.

B.     **Mitigation of Damages**

"[A] plaintiff alleging employment discrimination generally is required to mitigate damages by making diligent efforts to obtain reasonably comparable employment." *Brown v. Smith*, 827 F.3d 609, 616 (7th Cir. 2016) (citations omitted). "The employer generally bears the burden of proving a failure to mitigate, which entails showing not only a lack of 'reasonable diligence' but also 'a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence.'" *Id.*

Driveshaft requests an order limiting Miller's ability to seek damages in the form of lost wages. (Filing No. 28 at 14.) It is undisputed that, following his termination from Driveshaft, Miller found comparable work at another manufacturer, Sacoma, and was separated from Sacoma after approximately six months. Miller testified that he believed, that after Sacoma received knowledge of the present lawsuit against another company, that his treatment at Sacoma began "going downhill" as Sacoma's management did not want to employ persons they deemed litigious. (Filing No. 29-2 at 100.)[2] At Miller's deposition, in November 2017, Miller testified that while he has looked for work, he would not accept employment while this lawsuit was ongoing due to his concern about prospective employers finding out about this lawsuit and to avoid burning bridges like the situation at Sacoma. *Id.* at 103-104. Nevertheless, Miller obtained employment in December 2017 as a driver for his father, who contracts with the U.S. Postal Service to deliver mail. (Filing No. 33-1 at 4.)

"The plaintiff's burden to mitigate damages does not require success, but only an honest, good faith effort to locate comparable employment." *Hutton v. Sally Beauty Co.,* No. 4:02-CV-

---

[2] Miller testified that his separation from Sacoma occurred over the telephone, and that they did not terminate him, however, his employment was heading towards a dead end of either him quitting or being terminated due to the present case. (Filing No. 29-2 at 100.)

9

00190-SEB-WG, 2004 WL 2397606, at *3 (S.D. Ind. Oct. 22, 2004) (citing *E.E.O.C. v. Ilona of Hungary, Inc.*, 97 F.3d 204, 216 (7th Cir. 1996); *Smith v. Great American Restaurants*, 969 F.2d 430, 438-39). In *Hutton,* the court found that the employer met its burden in showing that the employee did not mitigate her damages based on the fact that comparable jobs were available and the plaintiff admitted that she made only a single attempt to find a comparable job. *Id.* at *3-4. Although the court found in the employer's favor, the court also noted "had Ms. Hutton sought comparable work (managerial responsibilities) and, finding none available, stayed with her non-managerial bartending job, she would likely have satisfied the obligation of reasonableness in her duty to mitigate." *Id.* at *4.

Driveshaft requests an order limiting Miller's damages to those occurring prior to Miller's separation from Sacoma in August 2017. ([Filing No. 28 at 15.](#)) In support, Driveshaft offers that searches on various job databases (*e.g.,* Monster.com; Careerbuilder.com, and Zip Recruiter) revealed that numerous job opportunities existed for a machinist in Miller's geographical area comprising approximately 50 miles from Hope, Indiana during the past six months. *Id.* at 14. Unlike *Hutton*, Miller has not conceded that he made only one attempt to find a job. In fact, Miller gained employment at Sacoma shortly after his termination from Driveshaft and alleges that he was separated from employment with Sacoma after Sacoma became aware of the pending litigation. Miller was then unemployed for approximately three months between the time of his separation from Sacoma and his current employment with his father. A period of unemployment of approximately three months falls far short of Driveshaft's burden to prove Miller did not make a good faith effort to find comparable employment, particularly where Miller alleges that he was looking for employment. Additionally, in *Brown*, the Seventh Circuit considered self-employment following an employee's termination from a municipal transit system. "[S]elf-employment, if

reasonable, counts as permissible mitigation." *Brown,* 827 F.3d at 616. The Court finds that Miller has mitigated his damages based on the fact that he found employment at Sacoma and with his father following his termination from Driveshaft. Defendants have not met their burden of showing evidence that a period of three months of unemployment and Miller's successful attempts at employment were not reasonable. Accordingly, the Court **denies** Driveshaft's request to issue an order limiting damages.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' Motion for Partial Summary Judgment (Filing No. 27) is **GRANTED in part**, and **DENIED in part**. Summary judgment is **GRANTED** on Miller's negligent supervision and retention claim, and **DENIED** on his claim for mitigation of damages. Miller's claims for interference with FMLA rights, retaliation, as well as his state law claim for defamation remain pending for trial.

**SO ORDERED.**

Date: 7/30/2018

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jeffrey S. McQuary
BROWN TOMPKINS LORY
jmcquary@btlmlaw.com

Koryn Michelle McHone
BARNES & THORNBURG, LLP (Indianapolis)
kmchone@btlaw.com

R. Anthony Prather
BARNES & THORNBURG, LLP (Indianapolis)
tony.prather@btlaw.com

Terry W. Dawson
BARNES & THORNBURG LLP (Indianapolis)
terry.dawson@btlaw.com